# UNITED STATES DISTRICT COURT

### for the

Middle District of North Carolina ▢

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information Associated With The Cellular Devices<br>Assigned Five Different Call Numbers That Is Stored At<br>Premises Controlled by T-Mobile, U.S. | ) )<br>) )<br>) )<br>) )<br>) )    Case No. 1:25MJ**35** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1347, 1512(b)(3), and 1957 | Health Care Fraud, Witness Tampering, and Conducting Transactions in Criminally Derived Property |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

| | |
|---|---|
| On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1. | /s/ Drew LeFaivre<br>*Applicant's signature*<br><br>SA Drew LeFaivre, HHS-OIG<br>*Printed name and title* |

Date: 2/5/2025

City and state: Winston-Salem, North Carolina

Joi Elizabeth Peake, U.S. Magistrate Judge
*Printed name and title*

*Judge's signature*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS 336-587-3223, 336-285-1749, 336-781-7630, 336-781-7631, and 336-888-9452 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE, U.S. | Case No. _1:25mj 35_ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Andrew LeFaivre, having been duly sworn, depose and state:

### INTRODUCTION

1.      I am investigating a conspiracy to commit health care fraud and money laundering, as well as obstruction of justice related to that investigation. I make this affidavit in support of an application for a search warrant for location information associated with multiple cellular devices whose service is provided by T-Mobile, headquartered in Parsippany, New Jersey. The information is sought pursuant to Title 18 U.S.C. § 2703(c)(1)(A) and is described in Attachment A.

2.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully assert that there is probable cause to believe that violations of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1957 (Conducting Transactions in Criminally Derived Property) (the "SUBJECT OFFENSES"), among others, have been

committed by Izhan Khawaja, Hamza Khawaja, Chaudhry Ahmed, and companies attributed to Chaudhry Ahmed, including Dune Medical Supply, LLC, and Prospect Health Solutions, Inc. In addition, I assert that violations of 18 U.S.C. 1512(b)(3) (Witness Tampering) have been committed by Hamza Khawaja and Izhan Khawaja. I further submit that based on the evidence set forth below, and all reasonable inferences from that evidence, there is probable cause to believe that the location information described in the attachments will constitute evidence or lead to evidence, contraband, or fruits of these criminal violations.

## AGENT BACKGROUND AND KNOWLEDGE

4.      I am employed as a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG") and have been so employed since 2002. As a Special Agent with HHS-OIG, I am responsible for investigating allegations of fraud against HHS programs, including the Medicare program.

5.      I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure. As a Special Agent, I have received extensive training related to health care fraud schemes and have conducted or participated in numerous investigations of alleged violations of health care fraud and related statutes.

6.      The information contained in this affidavit is known to me through involvement in the investigation, my background, training, and experience, and

2

information provided by other individuals, investigators, and agencies involved in this investigation, including the Federal Bureau of Investigation ("FBI").

7.     I know from my training and experience that individuals who engage in criminal activity, including health care fraud and money laundering, use cell phones to: (1) access websites to facilitate illegal activity, (2) communicate with co-conspirators about the scheme, (3) store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators, email correspondence, text or other "Short Message Service" (SMS) messages, contact information of co-conspirators, financial data, including bank account numbers and information, cryptocurrency wallets and passwords, and credit card numbers; (4) keep track of co-conspirator's contact information, (5) keep a record of illegal transactions for future reference, and (6) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.

8.     I know from my training and experience that individuals often carry cellular devices on their persons or keep them close by and that users routinely retain their cell phones for many months or years. Therefore, cell site location history can be useful to the investigation by revealing the location of individuals' phones at relevant times and showing association between conspirators due to common location.

## TARGET CELLULAR DEVICES

9.      As described in Attachment A, this application seeks a warrant for information from T-Mobile associated with the following cellular devices for the listed periods:

   a.  **336-587-3223:** T-Mobile records show that this number was subscribed to Chaudhry Ahmed beginning on February 1, 2024. Ahmed told investigators he was initially going to use this number, but then Izhan Khawaja told him it would be used it as a phone number for Dune Medical Supply. I am seeking records for the period of February 1, 2024, to present for **336-587-3223**.

   b.  **336-285-1749:** T-Mobile records show that this number was activated on July 15, 2024, with Lyca Mobile, a mobile virtual network operator (MVNO) that uses T-Mobile's network to provide cellular service. Evidence shows that Izhan Khawaja regularly used this number to communicate with Ahmed. I am seeking records for the period of July 15, 2024, to present for **336-285-1749**.

   c.  **336-781-7631:** T-Mobile records show that this number has been subscribed to Hamza Khawaja since October 2021, but the investigation has found that this number was used by Izhan Khawaja. I am seeking records for the period of January 1, 2024, to present for **336-781-7631**.

   d.  **336-781-7630:** T-Mobile records show that this number has been subscribed to Hamza Khawaja since October 2021. The investigation has found that this

4

number was used by Hamza Khawaja. I am seeking records for the period of January 1, 2024, to present for **336-781-7630**.

e. **336-888-9452:** T-Mobile records show that this number was subscribed to Chaudhry Ahmed from May 28, 2024, to October 14, 2024. Ahmed told investigators he used this phone number until August 23, 2024, when Izhan Khawaja took his phone from him prior to Ahmed's planned travel to Pakistan. I am seeking records for the period of May 28, 2024, to October 14, 2024 for **336-888-9452**.

## JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### The Subject Offenses

11.     Title 18 United States Code, Section 1347 prohibits health care fraud. "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice— (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the

5

delivery of or payment for health care benefits, items, or services[,]" shall be guilty of a crime.

12.     Title 18, United States Code, Section 1957 prohibits, "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]"

13.     Title 18, United States Code, Section 1512(b)(3) makes it a crime for anyone to "knowingly use intimidation, threaten, or corruptly persuade, or attempt to do so, or engage in misleading conduct towards another person with intent to— (3) hinder, delay, or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a Federal offense."

## Background on Medicare and Durable Medical Equipment

14.     The Medicare Program is a federally funded health insurance program for eligible persons 65 years of age and older, and certain disabled persons, under which physicians, hospitals and other health care providers are compensated or reimbursed for covered medical services and supplies provided to Medicare beneficiaries. Medicare is a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b).

15.     Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS").

16.     Medicare is subdivided into multiple program "parts." Medicare Part A covers health care services provided by hospitals, skilled nursing facilities, hospices, and

6

home health agencies. Medicare Part B covers physician and other licensed provider services and outpatient care, including an individual's access to durable medical equipment ("DME").

17.    DME includes orthotic devices, such as knee braces, back braces, shoulder braces, wrist braces, and other devices. Under Medicare Part B, beneficiaries only receive Medicare-covered DME from "suppliers" that are enrolled in Medicare.

18.    DME is equipment designed for repeated use and for a medical purpose, such as orthotic devices (including back, arm, and knee braces), wheelchairs, prosthetic limbs, collagen dressing, gauze, and hydrocolloid dressing.

19.    Medicare reimburses DME companies for items and services rendered to beneficiaries. To receive payment from Medicare, providers must submit or cause the submission of claims to Medicare.

20.    To enroll in Medicare Part B, DME suppliers are required to submit a completed enrollment also known as the "Form CMS-855S" to Medicare. The Form CMS-855S lists many standards necessary to obtain and retain Medicare billing privileges as a DME supplier.

21.    The Form CMS-855S requires applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or managing control of a DME supplier. This includes anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; anyone with a partnership interest in the

DME supplier, regardless of the percentage of ownership, any organizations with "managing control" over the DME supplier, as well as any and all "managing employees."

22.     The form also requires the signature of an "authorized official" who certifies, among other things, that the DME supplier will abide by all Medicare laws, regulations, and instructions and not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

23.     A Medicare claim for DME reimbursement is required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician or provider identification number of the provider who prescribed or ordered the equipment.

24.     Medicare reimburses claims for DME only if the DME was medically necessary for the treatment of the beneficiary's illness or injury, prescribed by an appropriate medical provider, and actually provided to the beneficiary as billed.

25.     The proper process involves examination of the patient by a physician or other appropriate licensed medical provider. After the examination, the provider is supposed to write a prescription for the beneficiary. The prescription should contain the patient's identifying information, the DME item that the treating provider believes is medically necessary for the patient, and the diagnosis codes relating the patient's medical

8

condition. Absent a valid certification by the treating physician/provider, Medicare lacks the statutory authority to pay the claim.

26.     The prescription is then provided to the DME company, which provides the necessary equipment to the patient and submits a claim directly to Medicare for reimbursement.

27.     The Healthcare Common Procedure Coding System ("HCPCS" codes) are published by the American Medical Association. The codes are part of a uniform coding system used to identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians and other healthcare providers. DME suppliers use HCPCS codes to identify, describe and code equipment and materials that they supply. These codes are used to determine the reimbursement.

### The Relevant Parties

28.     Dune Medical Supply, LLC ("Dune") was a North Carolina corporation located at 2310 North Centennial Street, Suite 102 High Point, NC 27265, that purportedly provided DME to Medicare beneficiaries.

29.     Prospect Health Solutions, Inc. ("Prospect") was a Florida corporation located at 5460 North State Road 7, Fort Lauderdale, FL 33319, that purportedly provided DME to Medicare beneficiaries.

30.     Onyx Med Supply, LLC ("Onyx") is a North Carolina corporation located at 300 S. Westgate Drive, Suite F, Greensboro, NC 27407, that purportedly shipped DME on behalf of Dune and Prospect to Medicare beneficiaries.

9

31.     Chaudhry Ahmed ("Ahmed") was a resident of Guilford County and is the owner and registered agent of Dune and the owner and registered agent of Prospect. Prior to Ahmed, Izhan Khawaja ("Izhan") was the owner of both Dune and Prospect. According to Medicare enrollment documents, Ahmed is listed on the Form CMS-855S as the owner of both Dune and Prospect. Ahmed electronically signed the documents for Dune and Prospect in or about February 2024 and April 2024, respectively, and agreed that he would not present, or cause to be presented, any false or fraudulent claim for payment to Medicare; previous enrollment documents listed Izhan as the owner of Dune and Prospect.

32.     Hamza Khawaja ("Hamza") was a resident of Guilford County and is the member/organizer of Onyx. Hamza and Izhan are brothers who live in High Point, NC.

### The Fraudulent Scheme

33.     From on or about April 27, 2024, through present, Medicare received complaints from hundreds of beneficiaries or providers claiming that Dune was fraudulently billing Medicare for DME that the beneficiaries never received, requested, needed or the provider never ordered. To date, over 580 complaints have been received related to Dune.

34.     From on or about June 1, 2024, through present, Medicare received complaints from hundreds of beneficiaries or providers alleging that Prospect was fraudulently billing Medicare for DME that the beneficiaries never received, requested, needed or the provider never ordered. To date, over 450 complaints have been received related to Prospect.

10

### Claims Analysis: Dune

35.     A review of Medicare claims data revealed that Dune began submitting claims to Medicare around April 2024. Then from around April 2024 through around August 19, 2024, Dune submitted more than 36,000 claims for over 20,000 Medicare beneficiaries, resulting in claims reimbursement requests of over $56.3 million.

36.     Data analysis showed that Medicare has approved disbursement of more than $15.4 million to Dune.

37.     Of the total claims Dune submitted to Medicare, more than $54.1 million were billed to Medicare in the 60-day period ending August 19, 2024, which represented an increase of over 2,400% when compared to the previous 60 days. Based on my training and experience, I know that a significant increase in claim submission over a short period of time, as reflected in Dune's billings to Medicare can be indicative of fraud.

38.     Furthermore, analysis of claims data showed that for approximately 67% of the claims Dune submitted, the beneficiary that allegedly received DME had no prior relationship with the provider that allegedly ordered the DME. This is significant because, as explained, a DME order must be prescribed by an appropriate licensed medical provider based on the beneficiary's underlying condition. If a medical provider has no prior relationship with the beneficiary, it indicates the provider may not be one of the beneficiary's regular medical providers as well as they may not know whether the DME equipment was medically necessary. Based on my training and experience, I know that a high percentage of claims in which there is no prior relationship between the ordering

11

provider and the beneficiary, as reflected in Dune's billings to Medicare, can be indicative of fraud.

39.    Claims data also showed that approximately 75% of the beneficiaries on whose behalf Dune billed Medicare were identified in a separate investigation indicating that their identities were compromised and used unlawfully by individuals to obtain fraudulent reimbursements from Medicare. Based on my training and experience, compromised Medicare beneficiary information is shared or exchanged between fraudsters and is often used in subsequent fraudulent claim schemes.

40.    Dune also submitted claims to Medicare for more than 115 beneficiaries who were deceased prior to the date of service listed on the claim. Several of those beneficiaries died more than three years before the date of service listed on the claim.

### Claims Analysis: Prospect

41.    A review of Medicare claims data revealed that Prospect began submitting claims to Medicare around May 2024. Then from around May 2024 through around August 19, 2024, Prospect submitted more than 28,000 claims for over 17,000 Medicare beneficiaries, resulting in claims reimbursement requests of over $45.6 million.

42.    Data analysis showed that Medicare has approved disbursement of more than $17.8 million to Prospect.

43.    Of the total claims Prospect submitted to Medicare, more than $45.1 million were billed to Medicare in the 60-day period ending August 19, 2024, which represented an increase of over 8,600% when compared to the previous 60 days.

44. Furthermore, analysis of claims data showed that for approximately 70% of the claims Prospect submitted, the beneficiary that allegedly received DME had no prior relationship with the provider that allegedly ordered the DME. The significance of this is explained in paragraph 26.

45. Claims data also showed that approximately 77% of the beneficiaries on whose behalf Prospect billed Medicare were identified in a separate investigation indicating that their identities were compromised and used unlawfully by individuals to obtain fraudulent reimbursements from Medicare.

46. Prospect also submitted claims to Medicare for more than 50 beneficiaries who were deceased prior to the date of service listed on the claim. Several of those beneficiaries died more than three years before the date of service listed on the claim.

### Interviews of Beneficiaries

47. Investigators interviewed numerous beneficiaries who submitted complaints to Medicare/HHS. For example, Medicare beneficiary L.M. was interviewed by investigators in August 2024 after she previously contacted HHS-OIG's fraud hotline. L.M. reported that a back brace she did not need or want was delivered to her home with a return address from Onyx Med Supply listed on the box and paperwork from Dune Medical Supply enclosed.

48. L.M. called a telephone number she found listed for Dune Medical Supply and spoke to a man who said he worked in customer service for Dune. L.M. asked the man why Dune shipped her a back brace that was not ordered, but the man told her he could not

13

assist her and that she should contact Dune's manager instead. He provided the manager's name as Chaudhry Ahmed and his telephone number as **336-587-3223**. After calling and texting this number, L.M. eventually received a return call. L.M. explained that she wanted to know who ordered a back brace for her and the caller said that the Health Department of Tennessee ordered the back brace for her. L.M. lives in Illinois and has not received medical care in Tennessee. She told the caller, "This is fraud," and he responded, "I don't know what you're talking about." L.M. told the caller she would report him for fraud and he responded, "Good luck with that," and the call ended.

49.    In or around August 2024, Dune submitted a claim totaling approximately $1,533 to Medicare on behalf of L.M. for a prefabricated back brace (HCPCS L0635).

50.    In or around July 2024, Dune submitted claims totaling approximately $1,963 to Medicare for a customized back brace (HCPCS L0637) purportedly provided to beneficiary, D.U.

51.    Law enforcement officers interviewed K.G., daughter of Medicare beneficiary D.U. K.G. advised her mother, who resides in an assisted living facility, received a box containing a back brace. The box also contained documents which referenced Medicare would pay for it. D.U. informed K.G. that she did not order the brace. K.G. noted D.U. has suffered chronic back pain for a long time but does not do anything to treat it other than aspirin. K.G. provided photos of the brace, packaging, and documentation.

14

52.     Similarly, around August 2024, Dune submitted claims totaling approximately $1,715 to Medicare for a back brace (HCPCS L0651) purportedly provided to beneficiary, K.D.

53.     Law enforcement officers interviewed K.D. who confirmed she previously submitted a complaint regarding Dune Medical Supply. According to K.D., she received a box with no return label which contained a back brace. K.D. was not aware she was going to receive this brace because she does not have any problems with her back. She did not order the brace and believes her doctor would have called her if he had ordered it for her. K.D. attempted to contact Dune on two occasions. She left messages which were not returned.

54.     Claims data revealed in or around July 2024, Dune submitted claims totaling approximately $4,397 to Medicare for a back brace and knee braces (HCPCS L0651, L2397, L1852) for Medicare beneficiary, T.P.

55.     Law enforcement officers interviewed T.P. T.P. stated that he received a package that contained an invoice and several back and leg braces that he had not requested. T.P. stated that he contacted his physician regarding these braces and his doctor's nurse confirmed there had been no order for these braces from their office. T.P. stated that he called a company in High Point about returning the braces, and he was told that they had a piece of paper with his doctor's signature on it. The employee at this company told T.P. not to worry, the braces had already been paid for and there would be no expense to him.

T.P. stated that there were two companies involved in the shipment of the braces and the company in High Point was not the same as the company listed on the package.

56.    Medicare claims data also revealed in or around June 2024, beneficiary, S.L., received a back brace and knee braces totaling approximately $4,397 (HCPCS L0651, L2397, L1852).

57.    Law enforcement officers interviewed the alleged prescribing physician, Dr. S.P. S.P. confirmed she was informed by her patient, S.L., that they had received a back brace and knee braces. Dr. S.P. advised she did not order the braces and the patient does not have any medical problems which would necessitate a back brace or knee braces. Dr. S.P. does not recall receiving any phone calls or faxes asking her to sign an order for these items. Dr. S.P. noted she does not generally order braces as part of her practice.

58.    Several Medicare beneficiaries for whom Prospect and Dune submitted DME claims reported in complaints to Medicare that the fraudulent DME packages they received showed that the package was shipped from Onyx.

**Interview of Hamza**

59.    Law enforcement officers conducted a voluntary interview of Hamza as the owner of Onyx. Hamza was contacted at cellular telephone number **336-781-7630**.

60.    According to Hamza, who is Izhan's brother, the prior owner of Dune and Prospect, Hamza solicited Ahmed for Onyx to be the provider of DME for Dune and Prospect. Ahmed referred Hamza to a different individual, also known by the name Chaudhry (LNU), telephone number **336-587-3223**, who Ahmed advised manages the

16

DME business since he did not know much about it. Ahmed informed investigators that Izhan is the user of telephone number **336-587-3223**. Hamza claims that he spoke with Chaudhry (LNU) and signed contracts with Dune and Prospect to begin shipping DME on behalf of Dune/Prospect. Hamza advised he only spoke to Chaudhry (LNU) by telephone on a couple of occasions.

61.     Hamza also explained the process Dune/Prospect and Onyx used relating to the ordering, shipment, invoicing, and payment of DME. When ordering the DME, someone from Dune and Prospect would upload Excel spreadsheets via a dropbox. The spreadsheets contained information needed for Onyx to drop ship DME to the requested individuals. Some of the information on the spreadsheets included the patients' names and addresses, as well as the type of DME to ship them. During the interview, Hamza voluntarily provided an example of one of the spreadsheets using his cellular telephone. Hamza sent the example to investigators from his phone using the e-mail address onyxmedsupply@gmail.com.

62.     For invoicing, Onyx sent detailed invoices for the DME they shipped via e-mail to the above e-mail addresses for Dune and Prospect. Payments for these invoices were normally made by Ahmed to Onyx using Chase Bank cashier's checks. Ahmed confirmed that he obtained cashier's checks for Onyx, but at the direction of Izhan, and Ahmed always provided the cashier's checks directly to Izhan and Hamza. The payments came from Prospect Health even though it was payment for invoices for both Prospect and Dune.

17

63.     During the interview, Hamza looked in his phone for contact information for Ahmed. The contact was listed as Chaudhry @ Haripur, with a phone number ending in 9190. Haripur is the area in Pakistan where Ahmed is from. Hamza also showed an entry in his phone for Chaudhry LNU listed as Chaudhry @ Dune, **336-587-3223**.

### Bank Accounts Activity

64.     Investigators have obtained and reviewed information related to bank accounts in the name of Dune, Prospect, and Ahmed.

65.     Medicare records show that Dune directed its claim reimbursements to a bank account at Truist Bank. Investigation to date shows that Ahmed had access to the account. The Truist records show that between on or about May 7, 2024, and August 23, 2024, Medicare (including its contractors) deposited approximately $14,462,475 of claims reimbursement for DME into the account (hereafter Truist 0067). Based on Medicare data, Medicare also deposited approximately $975,000 into the account Truist 0067 from on or about August 24 through August 30, 2024. Medicare records show that Prospect directed its reimbursements to an account at JPMorgan Chase Bank. Bank records show that Ahmed had access to this account.

66.     Between June 4, 2024, and August 21, 2024, Medicare deposited approximately $8.9 million of claims reimbursement for DME into the JPMorgan Chase Account (hereafter Chase 5016). Based on Medicare data, Medicare also deposited approximately $8.9 million into Chase 5016 from August 22 through August 30, 2024.

18

67.     A review of financial records for Chase 5016 showed cashier's checks payable to Onyx totaling more than $750,000 during the approximate period of 07/22/2024-08/12/2024. Account ownership information listed telephone number **336-587-3223** associated with this account.

68.     On August 21, 2024 (i.e. two days before Ahmed's arrest), Ahmed withdrew $500,000 in cash, and $303,561 in the form of a cashier's check made payable to Onyx Med Supply, LLC from Chase 5016. Ahmed stated that he provided the cash to Izhan and typically would provide cashier's checks to Hamza.

69.     In addition to the August 21, 2024 in person withdrawal, Ahmed performed well over 20 in person bank transactions. Ahmed stated that these withdrawals were always at the direction of Izhan, and Izhan personally accompanied him to the majority of these trips. The visits to bank branches included traveling to different branches of the same financial institution, including in Guilford, Wake, and Mecklenburg counties. Izhan is on bank surveillance accompanying Ahmed to at least two banks: Chase Bank in Charlotte, NC, and Pinnacle Bank in High Point, NC.

70.     An analysis of Ahmed's account ending in 3805 shows that between August 5, 2024, and August 22, 2024 (i.e., one day before his arrest), Ahmed or someone purporting to be Ahmed, through eight different wires, wired over $1.8M to Coinbase – a cryptocurrency exchange that allows users to buy, sell, transfer, and store digital currency. The investigation to date has also revealed that the majority of those funds have been moved out of Coinbase.

19

71. According to Coinbase records, the account receiving these deposits is held in the name Chaudhry Ahmed.

72. Through voluntary account freezing and multiple seizure warrants issued out of U.S. District Court for the Middle District of North Carolina, the funds from numerous accounts, including, but not limited to the aforementioned Truist, JP Morgan Chase accounts and resulting cryptocurrency wallets, have been seized and/or frozen in anticipation of seizure.

### Arrest of Ahmed and Hamza Interference

73. On August 20, 2024, United States Magistrate Judge Joe L. Webster from the United States District Court for the Middle District of North Carolina issued a warrant for Ahmed's arrest based on probable cause that Ahmed engaged in a scheme to defraud Medicare, in violation of 18 U.S.C. § 1347. On August 23, 2024, law enforcement officers arrested Ahmed at the Charlotte-Douglas International Airport (CLT).

74. Ahmed's native language is Urdu, and for all court proceedings he requires the use of an interpreter. Ahmed's retained counsel, Jack Van Why ("Van Why"), also requires the use of an interpreter for his attorney-client privileged conversations with Ahmed. Hamza speaks both Urdu and English.

75. Shortly after Ahmed retained Van Why as defense counsel for Ahmed's criminal proceeding, Van Why retained an interpreter known to him by the name of "Ali Bhatti" for any attorney-client privileged communications. Van Why used "Bhatti" as an interpreter because Ahmed instructed him to do so. Ahmed later stated to law enforcement

20

that during a phone call with Hamza, Hamza told Ahmed that Hamza would act as an interpreter for Ahmed with his defense attorney. Hamza told Ahmed he would use the pseudonym "Ali" when posing as an interpreter. Ahmed agreed to this arrangement because, at the time, he believed Hamza and Izhan were going to manage everything for Ahmed and help Ahmed to get out of jail.

76. Van Why never met "Bhatti" in person. All interpreted conversations occurred with "Bhatti" on the telephone. The telephone number "Bhatti" used was a virtual phone number not tied to a specific cellular device, and one that anyone with the log in information can access.

77. On or about November 19, 2024, Ahmed informed the Government, via Van Why, that "Bhatti" is actually Hamza. That same night, Ahmed recorded a phone call, via his immigration attorney, with Izhan, Hamza, and an individual referred to as Sikander LNU (phonetic). Sometime after Ahmed's arrest, Hamza told Ahmed he should contact Sikander in order to communicate with Hamza and Izhan. Sikander would act as an intermediary between the Khawaja brothers and Ahmed. Hamza provided Sikander's phone number to Ahmed's immigration attorney. During the November 19, 2024 call, Sikander was the main person speaking with Ahmed, and Izhan and Hamza were in the background. In this conversation, Ahmed asked Izhan, Hamza, and Sikander when they will pay back money to the government, referring to the cash Ahmed obtained from the Chase 5016 bank account and provided to Izhan. Sikander, Izhan, and Hamza refused to provide the name of the individual to whom Izhan had allegedly given the cash. Ahmed

expressed his desperation that the money be returned to the government because he believes the return of the money will mean he can get out of jail. During this conversation, Ahmed stated Hamza's name multiple times, and Sikander told him not to say names.

78. On November 20, 2024, Ahmed informed the government that Hamza had told Ahmed that Hamza would be Ahmed's interpreter for conversations with his attorneys. Ahmed stated that Izhan and Hamza are involved in the health care scheme, and Ahmed was only involved in withdrawing money and business financial transactions but not operating the businesses. Ahmed stated that he provided cash and cashier's checks to both Hamza and Izhan when Izhan directed Ahmed to withdraw money from certain bank accounts.

79. Ahmed provided all login information to Dune and Prospect's bank accounts to Izhan. Geolocation information associated with Prospect's online banking indicates access from a location at or near the Khawajas' home address in High Point, North Carolina on multiple occasions. Ahmed also stated that he did not have the usernames or passwords to access the Dune or Prospect bank accounts online. He stated Izhan created the usernames and passwords for the businesses' online accounts.

80. Izhan regularly provided instructions and information to Ahmed regarding the businesses and related financial transactions via cellular phone. Izhan used the phone numbers **336-781-7631** and **336-285-1749** to communicate with Ahmed about the businesses and financial transactions. He primarily contacted Ahmed using these two numbers via the messaging application, WhatsApp. Call records also show telephone calls

22

during July and August of 2024 from **336-285-1749** to the primary phone number used by Ahmed during this time period, **336-888-9452**.

81.    Izhan and Hamza told Ahmed not to say their names in discussions with Ahmed's attorney. Ahmed stated that he was scared Izhan and Hamza would hurt his family in Pakistan if he cooperated with the government and provided information related to the health care fraud scheme and the Khawaja brothers' involvement. Ahmed further stated that Hamza would tell Ahmed how to answer Van Why during their attorney-client privileged meetings to make sure only certain information was provided to Van Why to protect Hamza and Izhan.

82.    On December 5, 2024, Van Why and Ahmed agreed to waive privilege and covertly record a purported attorney-client privileged conversation with Hamza as the interpreter. Van Why and Ahmed had this conversation under the guise that Ahmed would be deciding whether to cooperate with the government or instead go to trial. During this conversation, Van Why pressed Ahmed for information that would be helpful for cooperation to pass along to the government. Ahmed asked Hamza whether he should give any names for companies in the health care fraud scheme that assisted Ahmed's companies. After Ahmed gave the name of one company, called Ava, Hamza did not translate Ahmed's answer to Van Why. Instead, Hamza said, "no the paper, paper one, paper one company. The company that does the paperwork, tell him about that company." Once Ahmed identifies the other company as Care Consulting, Hamza provides that information in English to Van Why.

23

83. On December 19, 2024, there was a status conference in Ahmed's criminal proceeding in front of The Honorable Catherine C. Eagles.

84. Immediately preceding this hearing, Ahmed and Van Why agreed to covertly record a purported attorney-client privileged conversation with Hamza as the interpreter. During this conversation, Ahmed asked Hamza when Ahmed can expect to get the money that Ahmed had withdrawn in cash prior to his arrest to return to the government. Hamza advised Ahmed that the money will be available after December 20 or 21. Ahmed told Hamza that he cannot tell Van Why this date because Van Why will question how Ahmed knows this date. Hamza told Ahmed to tell Van Why that Ahmed's family told him this information. Hamza also instructed Ahmed to tell Van Why that Van Why can tell the Court about the return of the cash. Van Why had informed Ahmed, through Hamza, that returning the money would help Ahmed's defense in any trial or plea negotiations.

## **Arrest of Hamza and Subsequent Obstruction**

85. On December 31, 2024, United States Magistrate Judge Elizabeth Joi Peake from the United States District Court for the Middle District of North Carolina issued a warrant for Hamza's arrest based on probable cause that Hamza had engaged in illegal witness tampering, in violation of 18 U.S.C. § 1512(b)(3).

86. On December 31, 2024, law enforcement officers arrested Hamza at the Philadelphia International Airport. Customs and Border Patrol (CBP) records confirmed that Hamza was scheduled to depart the United States on December 31, 2024 with a final

destination in Pakistan. This flight was booked only three days before on December 28, 2024.

88. At the time of arrest, CBP and FBI agents seized Hamza's belongings incident to arrest, including a cellular phone.

88. As discussed above, Hamza showed law enforcement some of the contacts of co-conspirators in his phone. In addition, Ahmed indicated that he communicated with Hamza and Izhan through WhatsApp and via telephone, before and after Ahmed's arrest.

89. On January 1, 2025, the day after Hamza's arrest, Van Why received a text from the Bhatti virtual number stating that "Bhatti" would be unavailable for a few days due to a death in his family.

90. On January 5, 2025, the Bhatti virtual number texted Van Why and asked when Van Why would need "Bhatti" again.

91. On January 8, 2025, Ahmed and Van Why agreed to covertly record a purported attorney-client privileged conversation with "Bhatti" as the interpreter. According to Ahmed and Van Why, the individual purporting to be "Bhatti" sounded and acted differently than the previous "Bhatti."

## WIRELESS PROVIDER T-MOBILE

92. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide

25

service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

93.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the phones to which they respectively provide service that are identified in this affidavit. I also know that this wireless provider typically collects and retains cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

94.     Based on my training and experience, I know that T-Mobile also collects per-call measurement data, which T-Mobile also refers to as the "timing and advance." Timing and advance data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

26

95.     Based on my training and experience, I know that wireless providers, such as T-Mobile, typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers, such as T-Mobile, typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify a phone's user or users and may assist in the identification of co-conspirators.

## **AUTHORIZATION REQUEST**

1.     I seek historical cell site location information via this application because this information will assist me in the ongoing investigation that I have described above, including in the following ways: (1) reveal the presence of conspirators, or lack thereof, in the vicinity of banks where financial transactions occurred in person or via mobile application; (2) reveal the presence of conspirators during online banking transactions, claims submissions to Medicare, and phone calls involving witness tampering; (3) reveal concert of action and contact between conspirators; (4) confirm information provided by

27

Ahmed; (5) potentially identify previously unknown conspirators; and (6) potentiality identify locations where evidence and proceeds are stored.

2.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

3.    I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

/s/ Andrew LeFaivre
Andrew LeFaivre, Special Agent
U.S. Department of Health and Human Services
Office of Inspector General
Office of Investigations

In accordance with Rule 4.1(b)(2)(A), the Applicant appeared before me by telephone, was placed under oath, and attested to the contents of this Application, which was submitted to me by reliable electronic means.

2/5/2025

Honorable Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

## **ATTACHMENT A**

This warrant applies to records and information associated with the cellular telephones assigned the following call numbers ("the Accounts") during the identified periods that are stored at premises controlled by T-Mobile, U.S. ("the Provider"), headquartered in Parsippany, New Jersey.

336-587-3223 for the period of February 1, 2024, to February 5, 2025

336-285-1749 for the period of July 15, 2024, to February 5, 2025

336-781-7631 for the period of January 1, 2024, to February 5, 2025

336-781-7630 for the period of January 1, 2024, to February 5, 2025

336-888-9452 for the period of May 28, 2024, to October 14, 2024

# ATTACHMENT B

## I.  Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the identified period listed in Attachment A:

   a. The following information about the customers or subscribers of the Account:

      i.  Names (including subscriber names, usernames, and screen names);

      ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii. Local and long-distance telephone connection records;

      iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v.  Length of service (including start date) and types of service utilized;

      vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile

Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

31